IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs October 16, 2018

**THOMAS DOWLEN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Robertson County**
**No. 74CC3-2012-CR-58      Jill Bartee Ayers, Judge**



**No. M2018-00052-CCA-R3-PC**

The Petitioner, Thomas Dowlen, appeals the Robertson County Circuit Court's denial of his petition for post-conviction relief from his 2014 conviction for first degree murder and sentence of life imprisonment. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Thomas Dowlen.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; John W. Carney, Jr., District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Petitioner's conviction relates to the June 2011 shooting death of Candice Owens. This court affirmed the conviction and summarized the facts of the case as follows:

> The proof at trial included a stipulation that the defendant had been in a long-term relationship with Lindsey Hankins, and the two had a child together in 2009. Ms. Hankins left the defendant in the weeks prior to the homicide, and she began a romantic relationship with [David] Owens, the victim's brother. The victim, Mr. Owens, and the defendant exchanged text and voice messages regarding Ms. Hankins prior to the shooting. The messages were not introduced into evidence, but the stipulation established that the three were "squabbling" via text and voice message.

At the time of the shooting, the victim was in a romantic relationship with [Christopher] Williams. The two were habitual users of crack cocaine. Mr. Williams and the victim would sometimes stay at a motel, but they also occasionally stayed at Kenny Link's residence, which was the site of the shooting. Mr. Link was deceased at the time of trial, but Mr. Williams testified that he and the victim would either pay Mr. Link or provide him with drugs in exchange for a place to stay. Mr. Link's home was located on Twelfth Avenue, and there was a path from the back of Mr. Link's house to a nearby market. Across the street from the residence was a vacant lot with some gravel in it, and beyond the lot was the home of Mr. Randall Holland.

There was evidence introduced at trial that the defendant had recently been to Mr. Link's home and was aware that Ms. Hankins frequented the home. Talisha Harrison testified that she was living at Mr. Link's [home] around the time of the shooting and that the defendant had stopped by Mr. Link's home the morning of the homicide around 10:00 a.m. The defendant, who testified in his own defense, stated that three days prior to the shooting, he had stopped by the home of Mr. Link looking for Ms. Hankins. The defendant had heard that Ms. Hankins was selling medication prescribed for the defendant which the defendant used to treat pain for a prior gunshot wound to the leg. He did not find Ms. Hankins at Mr. Link's home on that date.

On June 30, 2011, the day of the shooting, Mr. Williams and the victim were awoken when the victim's brother, Mr. Owens, came to the motel room they had rented. After a discussion, Mr. Williams and the victim decided to use their remaining money not to pay for another night at the motel but to purchase crack cocaine and spend time with Mr. Owens. The three ate lunch and went to Mr. Link's home at around 10:00 or 10:30 a.m. All four consumed crack cocaine at Mr. Link's residence. Mr. Williams testified that there might have been other people who dropped by Mr. Link's house during the day, but he did not recall them. Mr. Williams testified that in the afternoon at around 2:50 p.m., Mr. Owens left to go to the market to get beer and cigarettes for himself.

James Pennington[1] spent June 30, 2011, with the defendant. Mr. Pennington called the defendant sometime after 9:00 a.m. and offered to pay for the defendant to get a haircut and to buy the defendant gas if the defendant

---

[1] Although this witness's name appeared in the conviction proceedings as Pennington, the post-conviction hearing transcript reflects Pendleton as the trial witness's surname. We have not altered the recitation of the trial facts taken from this court's previous opinion, and we use the name as it appears in the post-conviction proceedings.

would give him a ride to the house of his cousin, the barber. The defendant came to pick Mr. Pennington up in the defendant's mother's vehicle about thirty minutes later. Mr. Pennington called his cousin, but his cousin was not at home. The defendant and Mr. Pennington then went to the house of another of Mr. Pennington's cousins, where they smoked some marijuana.

At some time in the afternoon, the defendant's mother called and asked the defendant to bring her some beer. Mr. Pennington offered to pay, and the defendant drove them to the store. Mr. Pennington testified that as he was going into the store, a white man came out and kept the door open for him. Mr. Pennington learned later that this man was Mr. Owens. As Mr. Owens left the store, he and the defendant immediately began to argue. Mr. Owens approached the defendant, who put out his hands to distance himself. Mr. Owens, who had a "built up" physique, then punched the defendant. The defendant grabbed Mr. Owens and Mr. Pennington separated them. Mr. Owens then took off running down a path behind the market. Mr. Pennington testified that the defendant also saw where Mr. Owens was headed. The defendant's face was swollen where he had been punched, and he kept saying, "[L]ook at my face." The defendant drove off quickly and turned up Twelfth Avenue. The defendant then saw Mr. Williams and the victim on the porch of a house and hit the brakes, putting the car into park before it came to rest partially in the gravel lot and partially in the street.

The defendant reached under the seat and took out a gun, which he put into his pocket. Mr. Pennington stated he had not previously known about the gun. The defendant walked up to the porch and pulled out the gun. He then shot the victim. Mr. Pennington testified that the defendant shot the victim twice in the legs. The victim fell, making a motion to indicate "don't shoot me [any] more." The defendant, after a pause of "a couple" of seconds, then fired several more shots as he stood over the victim. According to Mr. Pennington, Mr. Williams was off to the defendant's side when he started shooting, and he was not near the direction the gun was pointed. On cross-examination, Mr. Pennington recalled from his prior testimony that Mr. Williams had retreated into the house while the defendant was shooting. Mr. Pennington did not hear the victim or defendant say anything. On cross-examination, he acknowledged having told police that the defendant asked where Mr. Owens was and the victim responded, but he testified he no longer recalled the exchange. The defendant, who had a previous gunshot wound to the leg, could not run, but he moved as quickly as he could back to the car. Mr. Pennington asked him what he had just done, and the defendant gave him a "dead" stare and appeared "daze[d]." The defendant drove off quickly, and

-3-

Mr. Pennington jumped from the car when the defendant slowed to make a turn. Mr. Pennington testified that he eventually gave a statement to police. He acknowledged that his statement to police did not indicate that the defendant shot, paused, and then fired more shots.

Mr. Williams testified that he, the victim, and Mr. Link were all in the living room of the home prior to the shooting. Because the front window was boarded up, they could not see outside without opening the door. Mr. Williams testified that around 3:15 p.m., he heard a car hit the gravel in the lot across the street, "like an accident just occurred," and he and the victim stood in the doorway to see what had happened. He saw the defendant driving the defendant's mother's car, which was a two-tone Chevy, and he saw James Pennington in the passenger's seat. The defendant looked angry, and his jaw was swollen. The car was facing the house.

Mr. Williams testified that the defendant got out of the car and asked where Mr. Owens and Ms. Hankins were. The victim gave a "smart" response, asking "[W]hat do you want[?]" The defendant then said, "Get under the wheel, Bro," to Mr. Pennington. The defendant reached across to his left pocket with his right hand and pulled out a .357 or .38 caliber silver-barreled gun. Mr. Williams testified that the defendant, who was on the top step, then shot the victim, first in the left and then in the right leg, and the victim fell. When the victim fell, she did not at first fall forward or backward but her legs came out from underneath her. The defendant then shot the victim three more times. Mr. Williams testified that the defendant walked with a quickened pace back to the car and got in the passenger's side. Mr. Williams acknowledged that he was focused on the victim at the time. Mr. Williams "ran around in circles trying to get somebody to call 911." According to Mr. Williams, no one threatened the defendant, and no one had any weapons except the defendant. Mr. Link, who remained in the home, was also not armed, and the back door to Mr. Link's home was secured by several knives jammed in between the frame and door. Mr. Williams acknowledged that he was currently in jail for violating his probation but stated that he was not gaining anything from his testimony.

Talisha Harrison, who was on probation for an unrelated aggravated burglary, also testified that she witnessed the shooting. According to Ms. Harrison, the defendant came to the house in the morning and stayed about five minutes. Sometime after 11:00 a.m., Mr. Williams and the victim arrived. The people present in the house all used drugs. Ms. Harrison did not recall seeing Mr. Owens prior to the shooting. Ms. Harrison testified that she went

-4-

to the market near the house to get a beer for the victim, brought it to the victim, and began to walk across the empty lot to Mr. Holland's house. While she was passing through the vacant lot, a car pulled up ten feet from her, with the driver's side facing Mr. Link's home. She identified a photograph of the car belonging to the defendant's mother as the car which pulled up next to her. Ms. Harrison then heard the victim shout, "Thomas, what are you doing back?" Ms. Harrison testified that the victim was the only person on the porch. When the defendant was in front of the steps leading to the porch, he shot the victim in the left leg. The victim fell backward and screamed. The defendant moved forward to the top of the steps and after a pause of a few seconds, he began to shoot again, shooting the victim, who was lying on the porch, five times. The defendant turned around and moved quickly to the car. The defendant had an "empty" stare as if "no one was there." Ms. Harrison observed that his cheek was injured. After the shooting, Ms. Harrison saw Mr. Owens outside, around the side of the house, shouting "to tell Cand[i]ce he was okay." Ms. Harrison testified that she believed the defendant got in the driver's seat and that she saw another person in the car. At the time, she did not know the other person, but during the course of the trial she recognized him and discovered it was Mr. Pennington. The car "spun off." Ms. Harrison ran to her mother's house. She did not observe anyone other than the defendant with a gun.

Randall Holland testified that he lived one street over from Mr. Link, on the other side of the vacant lot. Mr. Holland had a privacy fence through which he could not see Mr. Link's home. When Mr. Holland returned from work in the afternoon, his father, the victim's mother, and another man were in his back yard. Prior to the shooting, Mr. Holland saw Mr. Owens come into Mr. Holland's back yard. Mr. Owens had been running, was "sweaty," and was out of breath. Mr. Owens left after three or four minutes. Mr. Holland was getting a drink of water when he heard five shots. He heard one shot first and then four back-to-back. Mr. Holland checked on his father and saw the victim's mother run up to Mr. Link's porch. He could see that the victim was lying on the porch bleeding. The victim's mother came back, and Mr. Holland gave her a towel and called 911. He did not see anyone else on the porch but saw a heavy-set African-American man run out the back door of Mr. Link's home and saw the police put the man in a patrol car.

James Bush was working nearby, thirty-five feet in the air in the bucket of a truck, fixing an electrical light for the city. He heard three "pops" close together and saw an African-American man holding something in his hand run away from a house and get into a two-toned car. He saw the victim lying

down in the porch but did not see anyone else on the porch. Mr. Bush took a photograph of the vehicle, which moved off quickly.

The defendant, testifying on his own behalf, generally confirmed Mr. Pennington's account of the morning. He testified that Mr. Pennington called him around 10:00 a.m. and that they had attempted to get a haircut and spent some time at Mr. Pennington's cousin's home, where the defendant smoked some synthetic marijuana and the others smoked marijuana. The defendant's mother then called and asked him to get her beer. Mr. Pennington offered to pay for the beer, and so the defendant went to the market of Mr. Pennington's choice.

The defendant testified that as soon as he pulled in, Mr. Owens came out the door and began to argue with him. The defendant's window was down, and Mr. Pennington was still in the car. The defendant confirmed that Mr. Owens attempted to get close to him and he put his hand out to stop him. The defendant glanced at Mr. Pennington, and Mr. Owens took the opportunity to punch him. The defendant grabbed Mr. Owens and Mr. Pennington separated them. The defendant stated that an egg-shaped knot was immediately visible on his face in his reflection on the storefront. Mr. Owens began to come back, but Mr. Pennington "stepped up," and Mr. Owens then ran away. The defendant testified that he was angry, out of his mind, and enraged, and he stated that he drove off the sidewalk as he left the store. He confirmed that he kept telling Mr. Pennington to look at his face. The defendant testified that he was not planning to go to Mr. Link's house but that he saw the victim and Mr. Williams on the porch and that he then made a sliding stop in the gravel lot. He testified that he believed Mr. Owens would be in the house.

According to the defendant, Mr. Pennington handed him a .357 caliber chrome gun before he got out of the car. He put the gun in his pocket. As he walked toward the porch, the victim said, "Thomas, what the f**k are you coming up here for?" He also stated that he simultaneously asked where Mr. Owens was. He testified that when he got to the steps as the victim made her statement, he saw "a person's shoe start to run across inside the house." The defendant stated he did not see who it was, but he could tell it was a white man and believed it was Mr. Owens. He acknowledged that Mr. Link was also white and it could have been him. The defendant stated that he was shooting at the person inside the house and that he heard someone scream as he was shooting. The defendant testified that he did not realize he had shot the victim

-6-

and that he did not recall much after the first shot. He acknowledged that he knew that the victim was standing in front of the door that he was shooting at. He also acknowledged that he did not see anyone at the house with a weapon, but he speculated that someone could have had a weapon.

The defendant stated that he drove off after the shooting. Mr. Pennington took the gun from him and jumped out of the car with the gun. The defendant acknowledged that he did not seek medical treatment for his wounds, noting that he was "on the run" and afraid to go to a hospital. The defendant testified that he regretted shooting the victim. He also testified that he left because he was scared.

Officer Charles Haynes was dispatched to the scene at 3:30 p.m. and saw the victim's mother, who was deceased at the time of trial, holding the victim and crying. An ambulance arrived, and the victim was determined to have died at the scene. Mr. Link, Mr. Williams, and a man named Billy Harrison were interviewed at the scene.

Detective Rickie Morris testified that he investigated the crime. He found the two-toned maroon Caprice parked by an abandoned house and received the defendant's mother's permission to search it. The search turned up an antique gun which was not involved in the crime and did not appear to function. The defendant testified that the gun in the back of the car was one he had found at a house when he moved. Law enforcement searched extensively for the defendant, and he was eventually put on the Tennessee Bureau of Investigation's most wanted list. He was apprehended in Georgia in September 2011, a few months after the homicide.

Dr. Sandra Thomas testified that the victim suffered six gunshot wounds. A wound to the victim's back which pierced the aorta and pulmonary artery would have been fatal even with immediate medical attention and would have caused death within minutes. The victim also suffered another gunshot wound to her back, which pierced her lung and fractured some ribs. Dr. Thomas stated that this wound could possibly have been survived if the victim had received immediate medical attention. The victim had a less serious gunshot wounds on her upper chest, her upper left leg, and her upper right thigh. Dr. Thomas testified that all of the victim's wounds except the one on her right thigh had stip[p]ling, which would indicate the weapon was fired from three to six feet away. The wound on the victim's chest had the most stip[p]ling, indicating the weapon may have been closer when that wound was inflicted. Another wound in the victim's left leg shattered the femur. This

wound would be consistent with the victim collapsing and being unable to stand. All of the shots had a downward trajectory. A bullet was recovered from the victim's right thigh. The parties stipulated that the bullet recovered from the victim was fired from a .38/.357 caliber firearm. The autopsy revealed that the victim had cocaine in her system. Dr. Thomas testified that the victim died of multiple gunshot wounds and that the manner of death was homicide.

Joshua Caldwell, who was incarcerated with the defendant, testified that the defendant had asked for his legal advice while they were housed together. The defendant told Mr. Caldwell that a man named J.D. was to testify against him and asked Mr. Caldwell if Mr. Caldwell thought that a homicide charge that J.D. had pending in Texas would affect J.D.'s credibility. The defendant then asked if Mr. Caldwell knew David Owens. He told Mr. Caldwell that his case started when he and Mr. Owens "got into it" earlier in the day and the defendant went looking for Mr. Owens. He told Mr. Caldwell that Mr. Owens's sister came out and "was talking sh*t" and that he "burnt the b*tch." The defendant then told Mr. Caldwell he wanted to make it seem as though the victim had been hit with shots fired from inside the house because the victim had been shot in the back and leg. The defendant also stated that J.D. had given him the gun used to accomplish the crime. Mr. Caldwell acknowledged prior felony convictions and stated that he had testified against his gang, the Aryan Nation, as well as against another inmate from Robertson County.

*State v. Thomas L. Dowlen*, No. M2015-01582-CCA-R3-CD, 2016 WL 6581350, *1-5 (Tenn. Crim. App. Nov. 7, 2016), *no perm. app. filed*.

The Petitioner filed the instant petition for post-conviction relief, alleging multiple instances of prosecutorial misconduct, multiple instances of the ineffective assistance of counsel, insufficient evidence to support his conviction, and violations of his due process rights. After the appointment of counsel, an amended petition was filed in which counsel stated that ineffective assistance was the only "post-conviction issue . . . found by appointed counsel." On appeal, the sole basis for relief is related to the ineffective assistance of counsel.

At the post-conviction hearing, the Petitioner testified that he was age forty and that he had been in confinement since his October 2011 arrest. He said that he and trial counsel met twice before the trial and that they spent a total of one and one-half hours together. When asked what he and counsel discussed at these meetings, the Petitioner stated that counsel believed at worst the Petitioner faced a conviction for second degree murder. The

-8-

Petitioner said he told counsel about an investigator from Inquisitor, Inc., used by previous counsel, the attorney who represented the Petitioner in the general sessions court. The Petitioner said that previous counsel provided discovery materials and that the Petitioner did not understand the evidence relative to the gunshot wounds to the victim's back. The Petitioner said that he asked previous counsel and trial counsel about the wounds but that he did not know if either counsel investigated the wounds.

The Petitioner testified that previous counsel provided him with the private investigator's report containing "a lot of stuff." The Petitioner said he told trial counsel that Christopher Williams, who testified for the State, had been convicted of killing one of the Petitioner's family members. The Petitioner said that trial counsel responded to the Petitioner's letters.

The Petitioner testified that he wanted trial counsel to file a motion to dismiss based upon lost evidence, that counsel filed the motion, and that the Petitioner was unsure whether the motion was resolved. The Petitioner said that he spoke to counsel once during the week before the trial. The Petitioner stated that the State initially extended a plea offer for twenty-five years, that another offer for fifteen years at 85% service was extended, and that he asked counsel to talk to the prosecutor about a fifteen-year sentence with 30% service. The Petitioner said that counsel never discussed the plea offer again.

The Petitioner testified that correction officer Adam Gibbs, whom the Petitioner knew from his pretrial confinement at the Robertson County Jail, was selected as a juror. The Petitioner said that Mr. Gibbs did not mention during jury selection that he worked as a correction officer and that the Petitioner told trial counsel about the relationship. The Petitioner said that counsel did not question Mr. Gibbs about his employment or whether he knew the Petitioner.

The Petitioner testified that trial counsel did not cross-examine Mr. Williams adequately. The Petitioner said that Mr. Williams testified that he saw the Petitioner walk on the porch looking for someone, that an argument ensued, and that the Petitioner shot someone. The Petitioner said that counsel did not question Mr. Williams about killing the Petitioner's cousin, about Mr. Williams's nephew's shooting the Petitioner previously, and about the general problems between the two families. The Petitioner said that although Mr. Williams was not present when Mr. Williams's nephew shot the Petitioner, Mr. Williams knew about the incident. The Petitioner noted that everyone in Springfield knew about the incident. The Petitioner said that had counsel questioned Mr. Williams adequately, the jury would have known Mr. Williams had a motive to "make it worse than it was."

The Petitioner testified that James Pendleton's preliminary hearing and trial testimony were inconsistent and that trial counsel did not question Mr. Pendleton about whether he was lying. The Petitioner stated that Mr. Pendleton testified at the preliminary hearing that the

Petitioner had the gun when he walked onto the porch but testified at the trial that the Petitioner grabbed the gun from under the seat. The Petitioner said that Mr. Pendleton handed the gun to him.

The Petitioner testified that all of the trial witnesses lied and that the only thing he could do was tell the truth. He said he should not have testified at the trial "without really knowing what was going on, really what to say." He said that during the *Momon* hearing, he told the trial judge that he was going to testify but that he and trial counsel had not discussed the benefits and pitfalls of testifying. He said that if he had more information, he would not have chosen to testify.

The Petitioner testified that if he had a complete picture of what to expect at the trial, he would have accepted the fifteen-year plea offer. He later said, though, that he would not have accepted the offer because he did not commit premeditated murder. He said he could have been guilty of second degree murder or manslaughter because he was attacked and not in a "right frame of mind." He stated, though, that psychological testing concluded that he understood the consequences of his actions. He said that a video recording from the "Discount Tobacco Store" showed the shooting, his being attacked, and Mr. Pendleton with a firearm. The Petitioner said, though, that he never reviewed the recording and that trial counsel never obtained it. The Petitioner said he knew of the recording because Mr. Pendleton told the Petitioner, the Petitioner's sister, and the Petitioner's cousin about it. The Petitioner thought the pretrial *Ferguson* motion was related to the recording. The Petitioner said that counsel reported talking to a store employee, who stated the employee would not testify because the employee did not want "problems" with the police department.

On cross-examination, the Petitioner testified that the shooting occurred behind the store but denied that the video recording from the store would have only captured the store parking lot. He said the recording would have shown his being attacked and Mr. Pendleton "with the weapon." The Petitioner agreed that Mr. Pendleton testified at the trial that Mr. Owens hit the Petitioner and that Mr. Williams testified at the trial that the Petitioner had a black and puffy eye. The Petitioner agreed that the trial testimony showed that Mr. Owens hit the Petitioner in the store parking lot and that the Petitioner drove to Mr. Link's home looking for Mr. Owens. The Petitioner disputed whether Detective Morris reviewed and possessed a copy of the video recording from the store.

The Petitioner testified that Mr. Pendleton handed the firearm to the Petitioner just before the Petitioner got out of the car parked outside Mr. Link's home. The Petitioner said that the video recording was relevant to show that he was attacked in the store parking lot and that Mr. Pendleton handed him the firearm used during the shooting. The Petitioner did not dispute that the victim was on the porch and talked to the Petitioner, that "the other person in the house took off," and that the Petitioner fired the gun. The Petitioner agreed

-10-

that Mr. Williams wore jail clothes during his testimony and told the jury about his previous convictions and drug use.

The Petitioner testified that he and trial counsel did not discuss the benefits and pitfalls of testifying and that counsel did not advise the Petitioner to stay calm when testifying. The Petitioner said counsel advised that the offense was second degree murder and that the Petitioner's maximum sentence would have been fifteen years. The Petitioner denied that counsel told him that if the Petitioner were convicted of first degree murder, the Petitioner would receive a life sentence. He said, though, that he knew and considered the punishment for first degree murder when deciding whether to accept the State's plea offer or to go to trial. He agreed the State was prohibited from asking him about his previous convictions.

Telena Stevens, the Petitioner's sister, testified that she learned about a video recording of the store parking lot altercation from Mr. Pendleton, who told Ms. Stevens that police officers laughed at the recording. She did not recall when her conversation with Mr. Pendleton occurred and said they did not speak anymore. On cross-examination, she stated that she never viewed the recording from the store.

Trial counsel testified that he had practiced law since 2007, that he began working for an experienced attorney, and that he began representing criminal defendants in general sessions and circuit courts in 2008. The Petitioner stipulated that the experienced attorney "was a very good attorney," and counsel stated that he learned how to practice law on his own but consulted the experienced attorney when needed. Counsel said that between 2008 and 2012, he worked on a few hundred criminal cases and that by 2012, he believed he could properly advise clients in criminal matters. He said he had four years of criminal defense experience and that he was confident he could handle a first degree murder charge.

Trial counsel testified that he began representing the Petitioner in 2012, after the Petitioner's arraignment in circuit court. Counsel recalled that previous counsel in general sessions court "had done a lot of the leg work," which included hiring a private investigator to interview witnesses. Counsel said that he obtained all of the information possessed by previous counsel and that he reviewed the discovery materials and the information obtained by the private investigator. Counsel said that he and previous counsel reviewed the details of the preliminary hearing testimony, that he met with the Petitioner at the jail to discuss "some matters" and to advise the Petitioner of the status of the case, and that, at the time of their first meeting, counsel and the prosecutor were discussing a possible plea agreement. Counsel recalled multiple "settlement" court appearances before the trial and said that he met with the Petitioner before some of these dates if it were "for a serious settlement date." Counsel disagreed with the Petitioner's assertion that counsel and the Petitioner only met twice before the trial.

-11-

Trial counsel testified that he and the Petitioner discussed the standard of proof necessary to secure a conviction, the elements of first degree murder, and the discovery materials. Counsel recalled the Petitioner's discussing a video recording from the store and Mr. Pendleton's inconsistent statements. Counsel said that he and the Petitioner discussed the State's case, the witness statements contained in the discovery materials, and the witness statements obtained by the private investigator. Counsel noted that the some of the witnesses provided inconsistent statements to the police and to the private investigator. Counsel said that the private investigator located a witness, Felisha Harrison, whom the police had not identified previously. Counsel recalled that Ms. Harrison initially did not want to get involved in the case but spoke to the private investigator. Counsel recalled that two witnesses, Mr. Link and the victim's mother, who provided police statements, had both died before counsel began working on the case.

Trial counsel testified that the defense did not dispute that the Petitioner was the shooter and that counsel and the Petitioner discussed the statements in which three witnesses and the utility workers saw the Petitioner fire the gun. Counsel said that the crux of the case was whether the incident was first degree murder, second degree murder, or manslaughter. Counsel did not believe the killing was first degree murder and said that the victim, the victim's brother, and the Petitioner had a troubled history. Counsel said that during a verbal altercation, the victim's brother "just straight out struck [the Petitioner] in the face . . . [and] ran behind the market in the direction of this house," that the Petitioner and Mr. Pendleton got in the car and drove to the house, and that the Petitioner was angry. Counsel said that the Petitioner never had a plan to kill the victim, although the Petitioner might have had "blind rage."

Trial counsel testified that he concluded second degree murder was the worst case scenario and that he and the Petitioner discussed a plea agreement. Counsel stated that the victim's brother's assaulting the Petitioner made it difficult to show premeditated murder. Counsel agreed, though, that the victim sustained five gunshot wounds, that nobody other than the Petitioner was armed, that the Petitioner walked an unspecified distance from the car to the front porch, that the Petitioner and the victim engaged in a "shouting match," and that at some point during the argument, the Petitioner pulled out a firearm and began shooting. Counsel said that he and the prosecutor discussed second degree murder with a sentence of at least twenty years and that counsel never received a plea offer in writing. Counsel recalled the Petitioner thought that twenty years at 85% service was too much prison time and that the case was more akin to manslaughter than to second degree murder. Counsel said the Petitioner would have accepted an offer for fifteen years at 30% or 35% service but that, based upon counsel's knowledge and experience with the prosecutor, counsel did not think the prosecutor would have agreed to any sentence requiring less than 85% service. Counsel

-12-

recalled that the prosecutor was not inclined to offer anything less than twenty years when they discussed the Petitioner's case.

Trial counsel testified that he investigated the video recording from the store, although he received "disjointed" information. Counsel recalled the Petitioner's sister stated that Mr. Pendleton told her that he had reviewed the recording with the detective assigned to the case. Counsel said that he received a report that a sheriff's deputy obtained a copy of the recording but that counsel could not verify the information. Counsel said that he went to the store and talked to the owner, who reported having no video recording and stated he would not testify even if counsel served him with a subpoena. Counsel said he did not find evidence that the State possessed a recording. Counsel said that he talked to the investigating detective about the case and recalled that the detective did not admit reviewing a recording. Counsel said that although a *Ferguson* motion was filed relative to the recording and arguments were made to the trial court, counsel did not "fully litigate the matter" because counsel could not establish that a recording existed or that the State possessed it.

Trial counsel testified that he filed almost twenty-four pretrial motions seeking to exclude various evidence, including the Petitioner's criminal history, "certain statements made here or there," and use of the word "murder." Counsel said he consulted the private investigator before the trial in an effort to find Mr. Pendleton but that nobody could find Mr. Pendleton. Counsel recalled that, at the time, it was unclear whether Mr. Pendleton intended to testify at the trial because Mr. Pendleton had been arrested relative to a firearm charge. Counsel said that the firearm involved in Mr. Pendleton's arrest was analyzed, that the analysis showed the gun was not involved in the shooting for which the Petitioner was convicted, and that the prosecutor provided counsel with an analysis report.

Trial counsel testified that, during jury selection, the Petitioner reported knowing Mr. Gibbs and that, before the trial, counsel reviewed the juror questionnaires and performed extensive online research of the potential jurors in an effort to better understand them. Counsel recalled discussing Mr. Gibbs with the Petitioner and said most of the witnesses in this case had criminal histories and had been incarcerated at the county jail where Mr. Gibbs worked as a correction officer and that, based upon this, counsel believed Mr. Gibbs would have known this when considering the witness testimony. Counsel did not recall specifically discussing with the Petitioner whether the defense should challenge Mr. Gibbs before jury selection but that, during jury selection, counsel told the Petitioner, "[W]e have a good jury up there." Counsel said that the Petitioner agreed and indicated he was satisfied with the jury and that the defense made no additional challenges.

Trial counsel testified that, before the trial, he told the Petitioner that the Petitioner had the right to testify, that the decision belonged to the Petitioner, and that they would discuss it more after the State presented its case. Counsel said that after the State's proof, the

Petitioner "instantly stated . . . he was going to testify." Counsel recalled that the Petitioner believed all of the witnesses had lied and that the Petitioner had to "set it straight." Counsel said he told the Petitioner that the decision belonged to the Petitioner, that he needed to stay calm and not show anger, and that he needed to think about his children. Counsel said that the Petitioner thought he could "keep [his] temper in check." Counsel said that he told the Petitioner that he would ask open-ended questions in order for the Petitioner to tell the jury what occurred. Counsel said he told the Petitioner, though, that the jury could not hold it against the Petitioner if he chose not to testify. Counsel said that the trial judge excluded any reference to the Petitioner's criminal history. Counsel recalled that during cross-examination, the Petitioner became angry, "slapp[ed] his hands hard on the podium," and insisted he was telling the truth.

On cross-examination, trial counsel testified that had represented clients in three previous jury trials, which included felony drug and burglary charges. Counsel said that his client in the drug-related case was convicted of one count and acquitted of another count. Counsel said that his client in the burglary case was convicted of both counts. Counsel did not recall the prosecutor's extending a fifteen-year plea offer and said his discussions with the prosecutor made clear that the State would not offer anything below twenty years. Counsel did not recall extending an offer to the prosecutor and said the prosecutor was not going to offer anything that did not require 85% service. Counsel agreed second degree murder as a violent offender would have required 85% service. Counsel testified that he did not provide the Petitioner with probabilities of being convicted of first degree murder, second degree murder, and manslaughter. Counsel said he told the Petitioner that the "best case scenario" was a manslaughter conviction, that the "absolute worst case scenario" was a first degree murder conviction with a life sentence, and that counsel thought there was a "strong probability" of a second degree murder conviction.

Trial counsel testified that the State was prohibited from saying the word murder, that the prosecutor used the word during his opening statement, and that the prosecutor immediately corrected himself by telling the jury that he should not have used the word. Counsel said that he decided not to object and to request a recess during the State's opening statement, that he considered requesting a curative instruction from the trial judge, which he rejected because it would have required the judge to repeat the word, and that he considered and rejected requesting a mistrial because he knew the comment did not rise to the level requiring a mistrial. Counsel said that he did not object at the next break in the proceedings or request a bench conference after the prosecutor finished his opening statement and that he did not want the jury hearing the word anymore that it already had.

Trial counsel described the Petitioner's tapping the witness stand as "a hammer down" beating and testified that the Petitioner slammed his hands three times during the testimony. Counsel agreed the firearm was never recovered by the police. Counsel said that

-14-

Mr. Pendleton did not indicate what happened with the firearm and noted that Mr. Pendleton claimed to have jumped from the Petitioner's moving car after the Petitioner drove from the scene. Counsel said that he did not research sentencing disparities based upon the racial composition of a defendant and a victim.

Trial counsel thought he asked Mr. Pendleton about whether he had reviewed the store's video recording before Mr. Pendleton's trial testimony. Counsel did not recall Mr. Pendleton's acknowledging that he had seen the recording. Counsel did not recall cross-examining Mr. Williams about his criminal history and said Mr. Williams testified in his orange jail jumpsuit and admitted habitual drug use and having "been in trouble various times."

The post-conviction court denied relief. The court credited trial counsel's testimony relative to "pre-trial issues" and found that counsel met with the Petitioner several times before the trial to review the case and the discovery materials, including the alleged video recording from the store. The court found that counsel investigated whether the recording at the store existed and that counsel could not file a *Ferguson* motion because the existence of the recording could not be verified. The court found that the trial testimony showed an altercation occurred between the Petitioner and the victim's brother before the shooting and that this was consistent with what the Petitioner believed the recording might have shown. The court found regardless of what the recording might have shown relative to Mr. Pendleton and a firearm, the Petitioner admitted having a gun when he left the car.

The post-conviction court found that the State offered the Petitioner a twenty-five-year sentence in exchange for a guilty plea to second degree murder and that the Petitioner rejected it. The court found that the Petitioner would not have accepted twenty-five years and that he knew of the first degree murder charge and potential life sentence. The court found that trial counsel and the prosecutor discussed a possible plea agreement and that even if counsel did not discuss a fifteen-year sentence, counsel knew, based upon their previous discussions, that the prosecutor would not have extended or accepted it.

The post-conviction court found that "the undisputed testimony" showed that the Petitioner did not object to Adam Gibbs serving as a juror. The court found that trial counsel impeached Mr. Williams "with admissible evidence" and determined that the trial court excluded evidence that Mr. Williams had killed the Petitioner's family member. The court found that counsel cross-examined Mr. Pendleton about inconsistencies between his preliminary hearing and trial testimony. The court found that the Petitioner knew the risks of testifying at the trial and made an informed decision to testify.

The post-conviction court found that the prosecutor's use of the word murder during his opening statement was addressed in the previous appeal, that the prosecutor corrected

-15-

himself and told the jurors that it was their job to determine whether the Petitioner was guilty of any classification of homicide. The court found that counsel's failures to object and to request a mistrial were not ineffective assistance of counsel.

The post-conviction court determined that the Petitioner failed to present evidence showing trial counsel provided deficient performance and that even if counsel's performance were deficient, the Petitioner failed to establish prejudice. This appeal followed.

The Petitioner contends the post-conviction court erred by denying relief. His argument focuses generally on his having "very little contact" with trial counsel, counsel's having "little experience in jury trials," and counsel's lack of advice about the Petitioner's testifying, plea negotiations, and "trial considerations." The State responds that the post-conviction court did not err by denying relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Hill v. Lockhart*, 474 U.S. 52 (1985). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the deficient performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of

-16-

the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## A.      Pretrial Preparation and Pretrial Motions

The Petitioner alleges that trial counsel spent little time on pretrial preparation. The Petitioner asserts that he and counsel only met once before the trial and that counsel offered little guidance about testifying, plea negotiations, and "trial considerations."

As a preliminary matter, the Petitioner complains that trial counsel also failed to file pretrial motions but does not state with specificity which motions should have been filed nor explain the merits of these motions. Although trial counsel's credited testimony reflects that he filed almost twenty-four pretrial motions seeking to exclude various evidence, including the Petitioner's criminal history, use of the word murder, and various pretrial statements, we will not speculate about which motions the Petitioner now argues should have been filed and how they might have benefitted the defense. *See* T.R.A.P. 27(a)(7)(A). The Petitioner is not entitled to relief on this basis.

Relative to pretrial preparation, trial counsel's credited testimony reflects that previous counsel hired a private investigator and participated in the preliminary hearing. Trial counsel obtained all of the information possessed by previous counsel, which included information from the private investigator. Trial counsel and previous counsel reviewed the details of the preliminary hearing testimony, and afterward, trial counsel met with the Petitioner at the jail to discuss the case. Counsel said that at the time of the first meeting, he and the prosecutor were engaged in plea negotiations. Counsel said that multiple "settlement" court appearances occurred and that he and the Petitioner sometimes met before a hearing if the hearing involved a "serious settlement date." The Petitioner rejected the plea offer of twenty years for second degree murder. Counsel disagreed with the Petitioner's assertion that he and counsel only met twice before the trial. Counsel and the Petitioner discussed the standard of proof, elements of the offenses, discovery materials, witness statements obtained by the private investigator, and the State's case, generally.

After evaluating the evidence, trial counsel believed that the facts supported a second degree murder conviction, and he discussed this with the Petitioner. They discussed the prosecutor's plea offer of twenty years, which the Petitioner rejected because of the length of service requirement and because the Petitioner believed the appropriate conviction offense was manslaughter. Counsel investigated the alleged video recording from the store showing the altercation between the Petitioner and Mr. Owens just before the shooting but could not establish that the recording existed or that if it existed, the police knew about or possessed it. Counsel attempted to locate Mr. Pendleton before the trial, but the private investigator could not locate him. Likewise, counsel advised the Petitioner that he had the right to testify and that the decision belonged to the Petitioner. After the State's proof, the Petitioner immediately told counsel that he wanted to testify because the witnesses lied and that he needed to tell the jury the truth. After the Petitioner chose to testify, counsel advised that he would ask open-ended questions in order for the Petitioner to tell the jury what occurred, that the Petitioner needed to stay calm during his testimony and not become angry, and that the jury could not penalize him if he chose not to testify. We note that the Petitioner disregarded counsel's advice about staying calm and slapped his hands on the witness stand repeatedly.

The record supports the post-conviction court's determinations that the Petitioner failed to establish counsel provided deficient performance and to show that any deficiency resulted in prejudice to the Petitioner. He is not entitled to relief on this basis.

## B.    Correction Officer Gibbs

The Petitioner argues that trial counsel failed to explain to the Petitioner why Mr. Gibbs was not challenged as a potential juror because the Petitioner told counsel that Mr. Gibbs was a Robertson County correction officer who guarded the Petitioner.

The record reflects that before the trial, trial counsel reviewed the juror questionnaires and performed extensive online research on the potential jurors in an effort to better understand them. Counsel and the Petitioner discussed Mr. Gibbs, and counsel testified that he told the Petitioner that most of the witnesses had criminal histories and had been incarcerated in the jail in which Mr. Gibbs worked and that Mr. Gibbs would have known this when considering the witness testimony. During jury selection, counsel told the Petitioner that counsel liked the jurors, and the Petitioner agreed and indicated he was satisfied with the selected jurors. The record supports the post-conviction court's determinations that the Petitioner failed to establish counsel provided deficient performance and to show that any deficiency resulted in prejudice to the Petitioner. He is not entitled to relief on this basis.

## C.    Christopher Williams Bias

The Petitioner argues that "cross-examination issues of witness bias . . . [were] not presented" by trial counsel. The Petitioner asserts that Mr. Williams had previously killed the Petitioner's cousin but that counsel made the "unilateral decision to forego" presenting this information to the jury. The Petitioner also notes that a family member of Mr. Williams had shot the Petitioner but that counsel did not present this evidence to the jury. The Petitioner asserts that had the jury known of the personal issues between the Petitioner and Mr. Williams, the jury might have reached a different verdict.

The record reflects that trial counsel did not recall questioning Mr. Williams about his criminal history but that Mr. Williams wore an orange jail jumpsuit during his testimony and admitted habitual drug use and having multiple legal troubles. The post-conviction court determined that the trial court excluded evidence at the trial of Mr. Williams's killing the Petitioner's family member and of a member of Mr. Williams's family having shot the Petitioner. The Petitioner did not present evidence at the hearing showing that this evidence was admissible, and the record does not preponderate against the post-conviction court's determination that the trial court excluded the evidence. As a result, counsel was prohibited from questioning Mr. Williams about the killing. We note, though, that a stipulation at the trial showed "squabbling" between the people involved in this incident. The record supports the post-conviction court's determinations that the Petitioner failed to establish counsel provided deficient performance and to show that any deficiency resulted in prejudice to the Petitioner. He is not entitled to relief on this basis.

## D.     Alleged Video Recording

The Petitioner's assertions relative to the alleged video recording of the store parking lot are as follows: "[A] video tape of the beginning of this encounter occurred which clearly showed [the Petitioner] being unarmed when he was assaulted. While the police claimed they never had this videotape, or it was 'lost'; that claim was disputed." We interpret the Petitioner's argument as an allegation that trial counsel provided ineffective assistance by failing to obtain and to present the recording as evidence.

Trial counsel and the Petitioner discussed the video recording during their meetings, and although counsel received "disjointed" information, counsel attempted to obtain a copy of the alleged recording. Counsel said that Mr. Pendleton reported to the Petitioner's sister that he viewed the recording with the detective assigned to the case. Counsel also received an unverified report that a sheriff's deputy obtained a copy of the recording. Counsel went to the store and spoke to the owner, who said that no recording existed and that he would not testify at the trial. Counsel spoke to the detective, who "did not admit" viewing the recording. Although a *Ferguson* motion was filed, counsel did not "fully litigate" the motion because counsel could not establish that the recording existed and that the State possessed it. Counsel thought he questioned Mr. Pendleton about whether he had viewed the recording,

and Mr. Pendleton did not acknowledge viewing the recording. The evidence does not reflect that the recording existed, and the Petitioner did not present the alleged recording at the evidentiary hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

In any event, the witness testimony at the trial was that Mr. Owens assaulted the Petitioner in the store parking lot just before the shooting occurred, and the Petitioner admitted that he had a firearm when he left his car outside Mr. Link's home. The record supports the post-conviction court's determinations that the Petitioner failed to establish counsel provided deficient performance and to show that any deficiency resulted in prejudice to the Petitioner. He is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE